NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

HAROLD B., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, C.B., L.B., R.B., *Appellees*.

No. 1 CA-JV 20-0088

FILED 11-19-2020

Appeal from the Superior Court in Mohave County
No.  B8015JD201804060
The Honorable Rick A. Williams, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Samuel A. Thumma delivered the decision of the Court, in which Judge D. Steven Williams and Judge David D. Weinzweig joined.

**T H U M M A**, Judge:

¶1 Harold B. (Father) appeals from an order terminating his parental rights to his three children. Because Father has shown no error, the order is affirmed.

**FACTS AND PROCEDURAL HISTORY**

¶2 Father and Tara S. (Mother) are the parents of C.B., L.B. and R.B.[1] Mother has significant cognitive deficiencies, functional limitations and behavioral health issues. She also was abused physically and emotionally and, as an adult, her father sexually abused her, with her mother's (maternal grandmother) facilitating that abuse.

¶3 Mother has been determined to be seriously mentally ill and has been diagnosed with depression and anxiety. Mother lacks self-awareness, and her conditions often make her aggressive, irrational and erratic. Mother's parental rights to two other children were terminated previously. After Mother's father died in June 2017, Mother began a relationship with Father.

¶4 In May 2018, Mother gave birth prematurely to twins, C.B. and L.B., who spent the next month in the neonatal intensive care unit. The Department of Child Safety (DCS) investigated after Mother became aggressive with hospital staff and tried to remove medical equipment from one of the babies. DCS found that the parents were unprepared for the children's release from the hospital and their home was unfit for premature twin babies. Moreover, maternal grandmother was living in the home.

¶5 Father agreed the parents' home was not appropriate for the children. He also acknowledged suffering from post-traumatic stress disorder but denied needing treatment. The next month, when the twins were released from the hospital, the parents still lacked adequate housing

---

[1] Mother's parental rights were terminated, and she is not part of this appeal.

so DCS took the twins into care and filed a dependency petition. The court later adjudicated the twins dependent and adopted a case plan of family reunification.

¶6  DCS provided the parents with rule-out substance abuse testing (substance abuse is not an issue in this case), a psychological evaluation and bonding assessment, parenting classes, a parent aide with visitation and housing resources. DCS also asked the parents to self-refer to Southwest Behavioral Health Services for mental health services, including individual therapy. The parents received additional parenting instruction and therapeutic visits through Mohave Mental Health Clinic and support services through another provider. Mother generally participated in services; Father refused behavioral health services but participated in the remaining services. Service providers noted ongoing concerns with Mother's ability to safely parent the children and Father's ability to recognize Mother's limitations and protect the children from her.

¶7  In August 2018, Mother completed a neuropsychological evaluation with Doctor Kelly Rodriguez. Dr. Rodriguez diagnosed Mother with a neurocognitive disorder after her testing revealed impairments in several areas. Dr. Rodriguez also noted that Mother did not have the coping skills to manage her impulsivity and turbulent emotions, which could put the children at risk of harm. Dr. Rodriguez stated that Mother needed to address her history of incest in counseling, but opined that even with counseling, "there [was] the possibility [that Mother] may not be able to develop the skills and support system needed to care for her children." Dr. Rodriguez concluded that the twins could not safely return home at that time.

¶8  Mother completed a psychiatric evaluation and participated in counseling through Southwest Behavioral Health, though her participation was inconsistent. During various sessions, Mother's counselors described her as unfocused, confused, agitated, tired, and as having "difficulty comprehending what is said." Although Mother participated in therapy, she refused to address her past trauma, or acknowledge that her father had sexually abused her.

¶9  In November 2018, Father completed bonding assessments through Mohave Mental Health. The therapist found that Father had a healthy attachment with the twins but noted he would "benefit from learning some additional parenting skills." In March 2019, Mother completed bonding assessments through Mohave Mental Health. The therapist found that Mother shared an unhealthy attachment with the

twins. The therapist noted that Mother was very inconsistent in her parenting skills, as she only sometimes responded to the children's cues, soothed them, or provided appropriate toys.

¶10 As the dependency progressed, Mother and Father obtained adequate housing but made only minimal behavioral improvements through the parent-aide services. By February 2019, the parents had progressed to in-home visits. Even so, the parent aide noted continual concerns about Mother's ability to safely parent the children and Father's ability to keep the children safe from Mother. The parent aide had to intervene or redirect the parents at almost every visit.

¶11 In April 2019—after a year of services—the parent aide noted that Mother "is still demonstrating a lack of skill in responding appropriately and identifying safety concerns" and she "is often redirected by Parent Aide and [Father] and has to be told multiple times how and why something is a safety concern." The parent aide also noted that Mother "does not always appear self-aware" and "becomes easily distracted and leave[s] the [girls] unattended." The parent aide reported that although Father was active in redirecting Mother, he "has not recognized why [she] poses a safety concern in caring for the girls." That same month, after a change in case plan to severance and adoption, DCS moved to terminate the parents' rights to the twins under the neglect ground, and the other grounds of mental illness and mental deficiency as to Mother.

¶12 In July 2019, Mother gave birth to R.B., who remained in the intensive care unit for three weeks for respiratory issues. In August 2019, when R.B. was released from the hospital, DCS took her into care and filed a dependency petition. The next month, DCS moved to terminate Mother and Father's parental rights to R.B. under the neglect ground and additionally as to Mother under the mental illness and mental deficiency grounds.

¶13 Concerns about the parents' ability to safely parent the children persisted. By October 2019, the parent aide reported that she still had to intervene often to prevent injuries to the children because Mother "continues to lack self-awareness, which leads to unsafe situations," and that Father still had not recognized why Mother poses a safety concern for the children. Once the parent-aide service closed, the DCS visitation officer reported similar concerns. Meanwhile, the parents moved back into an unsafe home for the children and allowed maternal grandmother to live in a recreational vehicle on the property.

¶14    The superior court held a contested termination adjudication in January 2020. After DCS rested in its case in chief, Father moved for a "directed verdict," which the court denied. After the trial, the superior court issued a ruling terminating the parents' rights. This court has jurisdiction over Father's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution, Arizona Revised Statutes (A.R.S.) §§ 8-235(A), 12-120.21(A) and 12-2101(A) and Arizona Rules of Procedure for the Juvenile Court 103 and 104 (2020).[2]

**DISCUSSION**

¶15    As applicable here, to terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground articulated in A.R.S. § 8-533(B) has been proven and must find by a preponderance of the evidence that termination is in the best interests of the child. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 12 (2000). Because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," this court will affirm an order terminating parental rights so long as it is supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009) (citation omitted).

¶16    On appeal, Father argues that DCS failed to make a diligent effort to provide Mother with appropriate services, which "directly affected" him. He further asserts that no reasonable evidence supports the termination order, and the superior court erred in finding that Father was "unable to protect the children from mother's deficits."

¶17    As part of the order terminating Mother's parental rights, the superior court found that DCS made reasonable efforts to provide her with adequate reunification services. Father argues that DCS's "failure to offer Mother . . . the specified services to address her cognitive deficits . . . directly affected" him, but he does not address whether he can raise this claim on appeal. *See* A.R.S. § 8-235(A) (only aggrieved parties may appeal from a final order); *In re Pima Cty. Juv. Action No. B-9385*, 138 Ariz. 291, 293 (1983) ("To qualify as an aggrieved party, the judgment must operate to deny the party some personal or property right or to impose a substantial burden on the party."). Because the finding pertains only to Mother's parental rights, it does not act to deny Father a personal right or bear directly upon his

---

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

personal interest in the children. *See In re Maricopa Cty. Juv. Action No. JS-5894*, 145 Ariz. 405, 408 (App. 1985) (mother lacked standing to challenge termination order pertaining to father).

**¶18** On the merits, the superior court found that Father was unable to provide the children with appropriate housing or supervision from Mother who posed a significant risk to their health and welfare. The court noted the issues Mother presented, including that she was "unable to recognize threats and safety risks for the children" and that she has "significant aggression and impulsivity issues," "is quick to anger" and "does not take redirection from either service providers or the father." The court found Father "is unable to protect the children from [M]other's deficits," that he "will rely on the mother to care for the children," and that grandmother would have access to the children if in the parent's care. The record supports these findings. The record also highlights how Mother's deficiencies place the children at risk of harm during normal daily interactions with her — in turn necessitating a second caregiver who must provide constant oversight of Mother and the children — which Father could not do.

**¶19** Although Dr. Rodriguez concluded that Mother needed to address her past trauma, Mother refused to do so. The case manager testified that Mother continues to assert that she had carried on a sexual relationship with her stepfather and therefore "doesn't recognize [her past incest] as abuse." Dr. Rodriguez voiced concern that Mother's denial nullifies her ability to protect the children from grandmother. Indeed, Mother stated she did not want to force grandmother to leave the property.

**¶20** Father likewise failed to show that he would protect the children from Mother or from grandmother. At trial, Father testified that he and Mother "spent much time going over [Mother's past trauma] and working through it." Moreover, when asked whether he believed that grandmother had acted inappropriately with Mother, Father testified, "I don't believe that." Nor did either parent articulate a plan to protect the children from grandmother. The parents also knew that DCS required safe housing, but Father testified that the home was still not ready for the children, and grandmother was still living on the parents' property.

**¶21** As noted above, Mother was unable to show minimally adequate parenting skills during the dependency, and the parent aide reported safety concerns on most visits. The visitation notes support the case manager's testimony that without continual oversight and intervention, the children would be at significant risk in Mother's care.

Despite Mother's inability to safely care for the children, Father only minimally enhanced his protective capacities during the case. Indeed, the case manager testified that at the time of the termination hearing, the parents' parenting skills had not significantly improved, and they were still receiving redirection for the same issues during visits. The DCS visitation supervisor reported that Mother still did not understand how to properly feed R.B. and picked her up incorrectly; Mother also became "overwhelmed," "emotional" and "cri[ed] with the children if they are upset." She further testified that although Father tries to redirect Mother, he is only successful "sometimes," and "becomes overwhelmed and doesn't know what to do."

¶22        The case manager expressed ongoing concern that Father did not fully recognize the risks Mother posed to the children. The parent aide similarly noted concern that Father minimized or failed to recognize Mother's issues. For example, at a visit in October 2019, Father left Mother to supervise the girls while he cleaned up, and the parent aide had to intervene to prevent serious injury as L.B. began falling from a slide. Mother appeared "completely unaware" and told the parent aide the child was "fine." Yet Father continued to express his reliance on Mother. He repeatedly told the parent aide that he could not handle the children on his own and needed to rely on Mother for help. He also maintained that he "does not have the equipment to raise the girls without" Mother.

¶23        At trial, Father testified that he would leave Mother if needed to protect the children. But he also testified that he and Mother were engaged, and he minimized her parenting deficits. Father testified that he felt Mother had made "major progress," that she "could do this" and that "it wasn't as bad as these people are making it out to be." Reasonable trial evidence supports the court's finding that Father is unable to provide the children with proper supervision and housing, causing unreasonable risk of harm to their health or welfare.

¶24        Father next argues that the superior court erred in finding that severance was in the children's best interests. To support his argument, Father points to testimony in the record favorable to his position. But the superior court considered the totality of the evidence, and this court will not reweigh it on appeal. Instead, this court looks to determine whether reasonable evidence supports the superior court's order. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002). "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990).

¶25        The court found that continuing the parent-child relationship would be detrimental because "it would delay permanency, leaving the children to linger in care for an indeterminate period." Indeed, after 20 months of services, Father had made only minimal improvements and was still unable to protect the children from Mother's mental-health and cognitive limitations. The case manager testified that the children would linger in foster care, until such time (if ever) the parents could reach an appropriate parenting level.

¶26        The court also found that severance would benefit the children because "it would further the plan of adoption, which would provide the children with permanency and stability," the children are in adoptive placements who are meeting their needs and the children are otherwise adoptable. The record supports these findings.[3]

## CONCLUSION

¶27        The order terminating Father's parental rights is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA

---

[3] Father also challenges the denial of his motion for a directed verdict, or judgment as a matter of law. The Juvenile Court Rules do not recognize such a motion and, even if they did, the court did not err in finding DCS's evidence was legally sufficient to withstand the motion. *See* Ariz. R. Civ. P. 50(a)(1) (denial proper when court finds a jury would have a "legally sufficient evidentiary basis to find for the party on that issue").